1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11   ROBIN T. SEXTON,              )    NO. EDCV 09-01754 SS
                                    )
12              Plaintiff,          )
                                    )
13        v.                        )    **MEMORANDUM DECISION AND ORDER**
                                    )
14   MICHAEL J. ASTRUE,             )
     Commissioner of the Social     )
15   Security Administration,       )
                                    )
16              Defendant.          )
     ───────────────────────────── )
17

18                          **I.**

19                      **INTRODUCTION**

20

21        Robin  T.  Sexton  ("Plaintiff")  brings  this  action  seeking  to

22   overturn  the  decision  of  the  Commissioner  of  the  Social  Security

23   Administration (hereinafter the "Commissioner") denying her application

24   for  Supplemental  Security  Income  ("SSI").   The  parties  consented,

25   pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned

26   United  States  Magistrate  Judge.   For  the  reasons  stated  below,  the

27   decision of the Commissioner is AFFIRMED.

28

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for SSI on October 19, 2006 (Administrative Record ("AR") 11, 137), alleging a disability due to a nerve disorder, "severe ankle," and diabetes (AR 147). She alleged a disability onset date of September 11, 2006. (AR 11, 137).

The Agency denied Plaintiff's claim for SSI initially on March 13, 2007. (AR 58). This denial was upheld upon reconsideration. (AR 65). On October 10, 2008, the ALJ conducted a hearing, at which Plaintiff was represented by counsel, to review Plaintiff's claim. (AR 25). The ALJ denied benefits on December 10, 2008. (AR 22). Plaintiff sought review of the ALJ's decision before the Appeals Council, which granted review but denied benefits on July 23, 2009. (AR 1).

Plaintiff commenced the instant action on September 18, 2009. Plaintiff filed a Memorandum in Support of the Complaint ("Plaintiff's Memo.") on March 23, 2010. The Commissioner filed a Memorandum in Support of Defendant's Answer ("Commissioner's Memo.") on April 21, 2010. Plaintiff declined to file a Reply. The matter is now ready for decision.

## III.

### FACTUAL BACKGROUND

Plaintiff was born on January 16, 1961 and was forty-seven years old at the time of the hearing. (AR 20, 30, 137). She has an eleventh

2

grade education.  (AR 186).  She worked in a restaurant preparing food in 1999 and at a department store in the ladies wear department and stock room in 2004.[1]  (AR 142, 154-56).  She last worked on June 1, 2004.  (AR 147).

## A.   Plaintiff's Medical History

### 1.   Treating Physicians' Records

In 2005, prior to the disability onset date, Plaintiff's records show that she sought mental health treatment, including prescriptions for Prozac, Lexapro and Ambian.  (AR 206, 217, 222, 241).  Plaintiff also reported a history of alcohol and marijuana abuse.  (AR 207, 209, 244, 252).  In April 2005, it was recommended that Plaintiff enter into substance abuse counseling.  (AR 251).  In describing her substance abuse issues in a May 2005 interview with Riverside County Department of Mental Health, Plaintiff reports a history of alcohol and cannabis abuse.  (AR 244).  In an April 29, 2005, "Participant Intake Document," one of Plaintiff's diagnoses was "alcohol abuse [illegible] R/O [rule out] Sedative Dependence."  (AR 252, 256).

In a May 5, 2005 appointment with her social worker, Plaintiff reported that her anxiety had "gone down" and she "feels fine." (AR 247).  She reported that she was appealing the denial of an earlier SSI application which was apparently based upon an alleged impairment of

---

[1]  Plaintiff testified that she last worked in 2005.  (AR 26).  The ALJ similarly states that Plaintiff last worked in 2005.  (AR 15).  This inconsistency is irrelevant, however, to the Court's analysis.

3

diabetes.  (AR 247).   Plaintiff reported that she "had help" now with her SSI process and "feels confident that she will get SSI."  (Id.).

On June 30, 2005, during an interview with her social worker, Plaintiff stated that "the one thing that was making her anxious, her ex-boyfriend, is gone out of her life" and she is "not feeling anxious or depressed."  (AR 232).   The social worker reported Plaintiff as saying that "she wants to stay on welfare until she can start to go to school and earn an LVN . . . [Plaintiff] talked about looking for work, although does not really want to work now because she will not be doing what she wants to do and when she starts school, will not have any time with her children . . . [Plaintiff] did say that she would be willing to do independent job search until her schooling starts."  (AR 232).

On July 21, 2005, Plaintiff reported decreased anxiety and no depression.  (AR 227).  On September 16, 2005, Plaintiff reported that everything was "fine."  (AR 215).   On October 3, 2005, Plaintiff's physician reported that Plaintiff was non-compliant with appointments and had discontinued her medication.  (AR 214)

Plaintiff fractured her ankle on September 11, 2006.  (AR 268, 319).  On September 29, 2006, an open reduction and internal fixation of left ankle bimalleolar fracture operation was performed.  (AR 268). Plaintiff was released from the hospital on the day of the operation with a good prognosis for recovery and instructions to follow-up in the orthopedic clinic in two weeks.  (AR 269, 270).  On December 22, 2006, Plaintiff's physician reported no edema, exposed metal, or sign of infection, and noted that sensation was intact.  (AR 262).  On July 18,

4

2007, an emergency room physician reported some tenderness and pain when the left ankle was moved. (AR 377). There was minimal swelling, no discoloration or warmth, and a small amount of clear drainage from around the left lateral malleolus. (Id.). Plaintiff was given a posterior splint, crutches, and a prescription for Vicodin. (AR 378). She was told to follow-up with her orthopedic surgeon. (Id.).

In another emergency room visit on October 3, 2007, the physician reported "mild soft tissue swelling to the medial and lateral malleolus with no clear deformity. Distal pulses are intact. Good capillary refill. No sign of neurovascular compromise." (AR 387). Plaintiff was given pain medication, a posterior splint, and crutches, and was then released. (Id.). A check up on October 30, 2007 reported diffuse soft tissue swelling and no change from October 3, 2007. (AR 403).

Plaintiff sought treatment in the emergency room on November 11, 2007, for a left toe injury. (AR 404). She was diagnosed with a partially avulsed left first toenail and sent home with medication. (AR 405). Later emergency room visits for conditions unrelated to ankle or foot pain did not reveal abnormalities in the ankle or foot. (See AR 414, 426, 434, 447, 458, 469-70). Plaintiff visited the emergency room on April 23, 2008 with a rapid heartbeat. (AR 447). She was treated and released. (AR 448).

A June 13, 2008 post-operative X-ray of the ankle found the ankle aligned, with asymmetric moderate posttraumatic osteoarthritis. (AR 359).

1    **B.    <u>Consultative Examinations</u>**

2

3         Dr. Carl B. Sainten, an internist, examined Plaintiff and issued

4    his report on January 27, 2007.  (AR 277).  Dr. Sainten reported that

5    Plaintiff's ankle had been operated on after a fracture and several pins

6    were placed in the ankle.  (<u>Id.</u>).  After one of the pins was removed on

7    November 30, 2006, the site became infected.  (<u>Id.</u>).  Plaintiff was

8    treated with antibiotics at least four times before the wound began to

9    heal.  (<u>Id.</u>).  Plaintiff complained of pain even when the ankle was not

10   bearing weight and more severe pain in cold weather.  (AR 278).  She

11   reported difficulty walking and stated she was incapable of doing "the

12   usual household chores such as cleaning, cooking, standing, sitting,

13   bathing, and climbing up and down stairs."  (<u>Id.</u>).  According to

14   Plaintiff, she needed either a wheelchair or a four point walker for

15   mobility.  (<u>Id.</u>).

16

17        Dr. Sainten found no evidence of edema or chronic stasis changes

18   in Plaintiff's ankles.  The range of motion in her left ankle was

19   restricted.  (AR 281).  Plaintiff's sensation was decreased to vibration

20   in the left ankle but otherwise intact.  (<u>Id.</u>).  Regarding Plaintiff's

21   gait, Dr. Sainten reported that Plaintiff could not stand, walk, stand

22   on heels and toes, or perform tandem gait.  (<u>Id.</u>).  In Dr. Sainten's

23   functional assessment, he found:

24

25        [Plaintiff] can lift or carry less than ten pounds

26        occasionally and less than ten pounds frequently. [Plaintiff]

27        can stand or walk for two hours in an eight hour day.

28        [Plaintiff] can sit for six hours in an eight hour day.

Pushing and pulling is limited in the lower extremities as noted.

Climbing, stooping, kneeling and crouching should be limited to frequently.

There are no manipulative, visual, communicative or environmental limitations.

(AR 282).

Dr. Romualdo R. Rodriguez, a psychiatrist, examined Plaintiff and issued a report on February 18, 2007. (AR 294). Plaintiff's chief complaint was anxiety, which she treated with Valium. (AR 294). Plaintiff's stressors included her son's discontinuation of his ADHD medication and the breakup of an emotionally abusive five-year long romantic relationship. (AR 295). Plaintiff also reported symptoms of obsessive-compulsive disorder. (Id.). Plaintiff denied drug or alcohol problems. (AR 296). Plaintiff reported that she was able to dress and bathe herself, run errands and go to the store with help, and cook and participate in household chores with help. (Id.). Plaintiff further stated that she could leave home alone, handle her own money, and pay her own bills. (Id.). Plaintiff reported a good relationship with family, a fair relationship with friends and neighbors, and no relationship with others. (Id.). She spent her time reading, watching television, using the telephone, eating, caring for herself, and spending time with her children. (Id.).

Dr. Rodriguez found Plaintiff cooperative with no psychomotor agitation or retardation and no evidence of exaggeration or manipulation. (AR 296-97). Plaintiff was coherent and organized; relevant and non-delusional. (AR 297). Plaintiff had no bizarre or psychotic thought content; suicidal, homicidal, or paranoid ideation; or recent hallucinations. (Id.). Plaintiff reported feeling helpless and hopeless at times, but not worthless or guilty. (Id.). Plaintiff's speech was normal, she was alert and oriented, and appeared to be of average intelligence. (Id.). She displayed no problems with memory, fund of knowledge, or concentration and calculation. (AR 297-98). Dr. Rodriguez noted that Plaintiff was unable to interpret the proverb, "people who live in glass houses shouldn't throw stones," and further found that Plaintiff's insight into her problems was "problematic." (AR 298). Dr. Rodriguez diagnosed Plaintiff with relationship problems and an anxiety disorder not otherwise specified and assigned Plaintiff a GAF of 70. (Id.). No functional limitations were found. (AR 299).

**C.   State Agency Review Physicians**

Dr. R.A. Bitonte issued a Physical Residual Functional Capacity Assessment on February 13, 2007. (AR 289). Dr. Bitonte established the following exertional limitations: Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour work day; sit about six hours in an eight-hour work day; and was not limited in pushing and/or pulling, except as noted. (AR 286). Plaintiff's postural limitations were the following: She could occasionally climb a ramp or stairs, stoop, kneel, crouch, and crawl; she could never climb a ladder,

rope, or scaffolds.  (AR 287).  There were no established manipulative, visual, communicative, or environmental limitations.  (AR 287-88).

Dr. K.J. Loomis performed a psychiatric review on March 1, 2007, which found Plaintiff's anxiety-related disorder not severe.  (AR 302). There were no functional limitations in the following categories: restricting activities of daily living, difficulties in maintaining social functioning, and repeated episodes of decompensation, each of extended duration.  (AR 310).  Plaintiff had mild limitation in difficulties in maintaining concentration, persistence, or pace. (Id.).

D.   **Third-Party Function Report**

Gloria Eselema, a friend of Plaintiff's, completed a third-party function report on November 12, 2006.  (AR 157).  Eselema reported that Plaintiff bathes herself in bed, dresses herself on her bed, cannot walk, can use a wheelchair only with help, uses a bed pan, and leaves her apartment only once a month for appointments with doctors.  (AR 157, 160).  At one point Eselema asserted that Plaintiff needs assistance to eat, but in response to a later question stated that Plaintiff can feed herself.  (AR 157, 158).  Plaintiff reportedly did not need reminders to take care of personal needs and grooming or to take medication.  (AR 159).  Eselema reported that Plaintiff could not cook for herself and did no household chores or yard work.  (AR 159-60).  She was also unable to drive because of her leg.  (AR 160).  According to Eselema, Plaintiff needed help paying bills, although she could count change and use money orders.  (Id.).  Eselema asserted that Plaintiff's hobby was watching

9

television and her only social activities were telephone based.   (AR 161).

Eselema reported that Plaintiff had no problems getting along with others, including with authority figures.   (AR 162, 163).   Eselema asserted that the following activities were affected by Plaintiff's ankle injury: squatting, standing, walking, kneeling, stair climbing, completing tasks, and concentration.   (AR 162).   However, Eselema also asserted that Plaintiff could pay attention "all day," finish what she started, and follow written and spoken directions very well.   (Id.).   Plaintiff also handled changes in routine very well, but did not handle stress well.   (AR 163).

**E.    Plaintiff's Written Reports and Hearing Testimony**

Plaintiff's Disability Report of October 30, 2006 (AR 145), reflects that subsequent to the ankle surgery, she was bedridden and could "barely get around."   (AR 147).

Plaintiff's November 13, 2006 Function Report indicates that she was bedridden and needed assistance to use a bed pan, sit up, take a bath, sit in a wheelchair, prepare meals, wash dishes, and clean house. (AR 165, 166, 167).   She stated that she wakes at 5 A.M., naps from noon until 2 P.M. and retires for the evening between six P.M. and 10 P.M. (Id.).   Plaintiff asserted she could not sleep because of pain.   (AR 166).   She asserted that she could dress, care for her hair, and feed herself without assistance.   (AR 166).   Plaintiff stated that she only left the house to see doctors.   (AR 168).   She shopped by phone.   (Id.).

She "need[ed] someone to go pay [her] bills for [her]" and had "no money in saving[s]." (Id.). Plaintiff asserted that she read, watched television, and telephoned with relatives and friends. (AR 169). She was not social since her ankle injury. (AR 170). Regarding her physical abilities, Plaintiff asserted that her injuries or conditions affected squatting, bending, standing, walking, kneeling, stair-climbing, and completing tasks. (Id.). She stated that she could not walk. (Id.). She finished what she began, could follow spoken and written instructions, got along with authority figures, and could handle changes in routine. (AR 170-71). She did not handle stress very well, had high anxiety, and stated that she must use crutches, a wheelchair and/or a brace/splint every day. (AR 171).

On June 24, 2007, Plaintiff filled out an Exertional Daily Activities Questionnaire. In it, she reported pain due to her ankle operation and shortness of breath. (AR 183). She asserted she needed assistance with "everything," including getting into the shower and using the toilet. (Id.). She asserted that she could cook for herself in her wheelchair, but had "no activities" because of her heartbeat. (Id.). She reported she could not walk, climb stairs, lift, or carry. (AR 184). According to the questionnaire, Plaintiff did not do her own grocery shopping, clean her house, drive a car, work on cars, or do yard work. (Id.). She slept five to six hours per night and napped for up to one and a half hours per day. (AR 185). She claimed to require crutches and a wheelchair every day. (Id.).

In a later Disability Report, Plaintiff reported osteoarthritis in both her knees. (AR 193). She also stated that she could only walk

11

slowly with crutches and that she had a limp, needed help with house work and occasionally with cooking. (AR 197). She further reported that she needed help in and out of the shower and help washing her clothes. (AR 197). Plaintiff added that she had a heart problem. (AR 198).

On October 10, 2008, Plaintiff appeared at a hearing before the ALJ. (AR 26). She stated that her previous work consisted of two months of work in 2000 at KMart in the ladies wear department and work in 2005 as a cook's helper.[2] (Id.). She testified that she had not applied for work since her injury. (AR 28). According to Plaintiff, she could not walk or stand for long periods of time; limped; required help to mop the floor, vacuum and sometimes to remove her shoes and socks. (Id.). Plaintiff reported no problems with drugs or alcohol. (AR 29)

Plaintiff described her ankle injury and operation, which placed "pins and screws and different hardware in the ankle to hold things together." (AR 30-31). All of the screws except for one (which has been removed) are permanent, and Plaintiff also has a permanent plate in her leg. (AR 31). Plaintiff continued to experience pain in her leg and ankle. (Id.). Plaintiff repeated that it was generally difficult for her to stand and walk for long periods of time. (AR 34). She asserted that on "good days," she could go shopping using a wheelchair;

---

[2] This conflicts with Plaintiff's Work History Report of November 12, 2006, which states that she worked in a restaurant in 1999 and at Kmart in 2004. (See AR 154). As noted above, however, this inconsistency is irrelevant to the Court's analysis.

1    on "bad days" she limped and it felt like the pins and screws were

2    coming out of her ankle.  (AR 35).  Plaintiff further testified that

3    some days she limped, and some days she was able to walk, although not

4    completely normally.  (AR 40).  She took aspirin and Vicodin for pain.

5    (AR 36).  Plaintiff was dubious about whether she could do work that

6    required her to sit throughout the work day, because she needed to stand

7    and move around periodically.  (AR 37-38).

8

9       Plaintiff testified that medication she took for her heart in the

10   middle of the day made her drowsy and she sometimes had to lay down or

11   "take a nap."  (AR 38).  She also sometimes had to lay down because of

12   pain in her ankle.  (AR 39).  Regarding her heart problems, Plaintiff

13   stated that her arrhythmia sometimes required a visit to the emergency

14   room.  (AR 40).  She also reported osteoarthritis in both knees.  (AR

15   42).  Plaintiff stated that she had seen a psychiatrist in the past for

16   "a couple of months," but was not currently seeing one, although she

17   "need[s] to call and make an appointment."  (AR 42-43).  She also

18   fractured a finger in her right hand in May 2008.  (AR 43, 44).

19   Plaintiff asserted that she has had troubles with anxiety since her

20   ankle operation, but was not taking medication for anxiety.  (AR 44).

21

22      Plaintiff reported that she typically spent much of the day on the

23   phone making appointments with doctors.  (AR 45).  She did light

24   housework and cooked and her two sons did heavy housework and sometimes

25   helped her cook.  (AR 46).  She reported that she napped for one hour

26   at noon because of the heart medication.  (AR 47).  She stated that she

27   sat down for about three-quarters of her waking hours.  (AR 47-48).  She

28   did not carry her medication, including her pain medication, with her,

1    but took her medications at set times during the day.   (AR 48-49).
2    Plaintiff reported that she was able to drive.   (AR 50).

3

4    **F.   Vocational Expert's Testimony**

5

6         Vocational expert Stephen M. Berry also testified at the hearing.
7    The ALJ asked him to assume a non-illiterate individual with an eleventh
8    grade education who can be on her feet for two hours out of an eight-
9    hour work day, but not all at one time.   (AR 52).   Furthermore, the
10   hypothetical individual could sit, but would need to stretch every
11   thirty to sixty minutes, could not lift more than ten pounds, would have
12   to "lie down during the lunch break," and would miss work one to two
13   times per month.   (Id.).   She would be limited to simple, repetitive
14   tasks.   (Id.).   The ALJ asked the vocational expert whether, assuming
15   the facts above and no past relevant work, there were unskilled jobs
16   that could be performed.   (Id.).   The vocational expert identified order
17   clerk and charge account clerk, and asserted there were other jobs that
18   could be performed which he did not identify.

19

20        Plaintiff's attorney then asked the vocational expert to add the
21   further limitation that the individual would have to elevate her leg to
22   hip height at will.   (Id.).   The vocational expert opined that the
23   individual would still be able to perform the previously identified
24   jobs.   (AR 53-54).   When Plaintiff's attorney added that the person
25   would need unscheduled breaks for about four hours out of the work week,
26   the vocational expert indicated that competitive employment could not
27   be sustained.   (AR 54).

28

                                    14

1

**IV.**

2

**THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

3

4        To qualify for disability benefits, a claimant must demonstrate
5    a medically determinable physical or mental impairment that prevents him
6    from engaging in substantial gainful activity[3] and that is expected to
7    result in death or to last for a continuous period of at least twelve
8    months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing
9    42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant
10   incapable of performing the work he previously performed and incapable
11   of performing any other substantial gainful employment that exists in
12   the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir.
13   1999) (citing 42 U.S.C. § 423(d)(2)(A)).

14

15       To decide if a claimant is entitled to benefits, an ALJ conducts
16   a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are as
17   follows:

18

19       (1)  Is the claimant presently engaged in substantial gainful
20            activity?  If so, the claimant is found not disabled.
21            If not, proceed to step two.

22

23       (2)  Is the claimant's impairment severe?  If not, the
24            claimant is found not disabled.  If so, proceed to step
25            three.

26

27        [3]  Substantial gainful activity means work that involves doing
     significant and productive physical or mental duties and is done for pay
28   or profit.  20 C.F.R. §§ 404.1510, 416.910.

15

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing her past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1); Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54.  If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"),[4] age, education, and

---

[4]   Residual functional capacity is "the most [one] can still do despite [one's] limitations" and represents an assessment "based on all the relevant evidence in [one's] case record."  20 C.F.R. §§ 404.1545(a), 416.945(a).

16

work experience.  Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do so by the testimony of a VE or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").  Tackett, 180 F.3d at 1101.  When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a VE.  Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

## V.

### THE ALJ'S DECISION

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (AR 11).  At the first step, the ALJ observed that Plaintiff had not engaged in substantial gainful activity since October 19, 2006.  (AR 13).  Next, he found that Plaintiff had the severe impairments of status post open reduction and internal fixation of left ankle bimalleolar fracture and repair of syndesmotic injury, post-traumatic osteoarthritis of the left ankle, and obesity.  (Id.).  The ALJ found Plaintiff's medically determinable mental impairment of anxiety disorder, not otherwise specified, nonsevere.  (Id.).  At the third step, he found that her impairments did not meet one of the listed impairments.  (AR 14).  Plaintiff had the residual functional capacity to perform a limited range of sedentary work.  (Id.).  Plaintiff could lift ten pounds occasionally and frequently; sit for six hours and stand for two hours out of an eight-hour work day, with the option to stand and stretch every thirty to sixty minutes.  (Id.).  Plaintiff could

17

occasionally climb, balance, stoop, kneel, crouch, and crawl.  (Id.). Plaintiff needed to be able to lie down on her lunch break and would miss work one to two times per month.  (Id.).  Finally, Plaintiff was limited to simple, non-repetitive tasks due to her pain medication. (Id.).  At step four, the ALJ noted that Plaintiff had no past relevant work.  (AR 20-21).

Considering Plaintiff's age, education, work experience, RFC, and the vocational expert's testimony, the ALJ found that jobs that Plaintiff could perform, such as order clerk and charge account clerk, existed in significant numbers in the national economy.  (AR 21). Plaintiff was therefore not disabled.  (AR 21-22).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The court may set aside the Commissioner's decision when his findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

"Substantial evidence is more than a scintilla, but less than a preponderance."  Reddick, 157 F.3d at 720.  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion."  Id.  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing

both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" <u>Aukland</u>, 257 F.3d at 1035 (quoting <u>Penny v. Sullivan</u>, 2 F.3d 953, 956 (9th Cir. 1993)).   If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. <u>Reddick</u>, 157 F.3d at 720-21.

## VII.

## DISCUSSION

Plaintiff contends that there are two errors in the Commissioner's decision.   First, she claims that the residual functional capacity assessment and hypothetical question the ALJ posed to the vocational expert were not supported by substantial evidence. (Plaintiff's Memo. at 2).   Second, she claims that the ALJ did not properly consider Plaintiff's subjective complaints.   (<u>Id.</u> at 4).   For the reasons discussed below, the Court disagrees with Plaintiff's contentions.

**A.   <u>The Residual Functional Capacity And Hypothetical Question Posed To The Vocational Expert Were Supported By Substantial Evidence</u>**

The ALJ's assessment of Plaintiff's RFC stated that Plaintiff had residual functional capacity to perform a limited range of sedentary work;  lift ten pounds occasionally and frequently; sit for six hours and stand for two hours out of an eight-hour work day, with the option to stand and stretch every thirty to sixty minutes; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (AR 14).   It further asserted that Plaintiff needed to be able to lie down on her lunch break

19

and would miss work one to two times per month. (Id.). Finally, Plaintiff was limited to simple, non-repetitive tasks due to her pain medication. (Id.).

The ALJ's hypothetical to the vocational expert asked the ALJ to assume a non-illiterate individual with an eleventh grade education. (AR 52). The individual could be on her feet for two hours out of an eight-hour work day, but not all at one time; sit with the option to stretch every thirty to sixty minutes; could not left more than ten pounds; would need to "lie down during the lunch break"; would miss work one to two times per month; and would be limited to simple, repetitive tasks. (Id.).

Plaintiff argues that the ALJ's RFC and the ALJ's hypothetical question to the vocational expert were not supported by substantial evidence because they failed to include all of Plaintiff's limitations. (Plaintiff's Memo. at 2). Specifically, Plaintiff argues that she requires an option to stand and stretch more often than every thirty to sixty minutes and lie down more often than merely on her lunch break. (Id.). In addition, Plaintiff maintains she would have to miss work more than three times per month due to her symptoms. (Id. at 4). Finally, Plaintiff argues that when she takes pain medication, she would be incapable of completing even simple, repetitive tasks. (Id.).

\\

\\

\\

\\

1        **1.   The  Residual  Functional  Capacity  Assessment  Was**

2        **Supported By Substantial Evidence**

4    "Residual functional capacity is what a claimant can still do

5  despite existing exertional and nonexertional limitations." Cooper v.

6  Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989) (citing 20 C.F.R. §

7  404.1545(a)).  According to Social Security Ruling 96-8p, "RFC is an

8  assessment of an individual's ability to do sustained work-related

9  physical and mental activities in a work setting on a regular and

10  continuing basis. A 'regular and continuing basis' means 8 hours a day,

11  for 5 days a week, or an equivalent work schedule." Soc. Sec. Rul. 96-

12  8p (July 2, 1996).  To determine residual functional capacity, the ALJ

13  must consider not only medical evidence, but also "subjective symptoms

14  such as fatigue and pain." Smolen, 80 F.3d at 1291.  An ALJ may reject

15  lay witness testimony only by giving legitimate, specific reasons

16  germane to the witness whose testimony is rejected.  See Regennitter v.

17  Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1298 (9th Cir. 1999).  On

18  review, improperly rejected lay-witness testimony must be given full

19  credit as true.  See Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d

20  968, 976 (9th Cir. 2000).

22  Sedentary work is defined as:

24     lifting no more than 10 pounds at a time and occasionally

25     lifting or carrying articles like docket files, ledgers, and

26     small tools.  Although a sedentary job is defined as one

27     which involves sitting, a certain amount of walking and

28     standing is often necessary in carrying out job duties. Jobs

1        are   sedentary   if   walking   and   standing   are   required

2        occasionally and other sedentary criteria are met.

4  20 C.F.R. § 404.1567(a).

6      There is substantial evidence to support the ALJ's RFC.  The report

7  by the consultative physician, Dr. Sainten, asserted that Plaintiff

8  could occasionally and frequently lift or carry less than ten pounds;

9  stand or walk for two hours in an eight hour day; and sit for six hours

10  in an eight hour day.  (AR 282).  This opinion is consistent with the

11  ALJ's RFC and alone constitutes substantial evidence supporting it.  <u>See</u>

12  <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001).

14      Other   aspects   of   the   RFC   are   supported   by   Plaintiff's   own

15  testimony.  Plaintiff testified that she would not be able to "sit[] all

16  day because I have to get up" for circulatory purposes.  (AR 37).  She

17  further testified that in her daily activities she got up to "maneuver

18  [her]self around."  (<u>Id.</u>).  She asserted that, although she could not

19  stand and walk for long periods of time, she could walk, either with a

20  limp or "crooked."  (AR 40).  She estimated that she sat down for about

21  three-quarters of her waking hours.  (AR 47-48).  Regarding her need for

22  naps, Plaintiff testified that (a) she took her medication at specific

23  times during the day (AR 48-49); (b) she took her heart medication at

24  noon (AR 47); and (c) she then napped at noon for one hour out of a day

25  with  fifteen  waking  hours  (<u>id.</u>;  <u>see also</u>  AR 38).  This testimony

26  constitutes  substantial  evidence  to  support  the  ALJ's  findings  that

27  Plaintiff could sit for six hours out of an eight hour day with breaks

28  to  move  about  and  that  she  would  need  a  break  to  nap  at  midday.

22

1   Testimony that Plaintiff had "good and bad days" and spent most of her
2   time on the phone making appointments with doctors (see AR 31, 34, 45)
3   supports the finding that Plaintiff would miss one to two days per month
4   of work, a limitation that the ALJ included in the hypothetical.

6        Finally, the record does not support Plaintiff's argument that
7   medication would prevent her from being able to complete simple,
8   repetitive tasks.  Rather, Plaintiff testified that her heart medication
9   requires her to take a nap at mid-day, as noted above.  As for her pain
10  medication, Plaintiff testified that she takes aspirin and Vicodin for
11  pain and that "it helps a little bit.  Sometimes nothing helps."  (AR
12  35-36).  She further testified that she "could probably use [her] hands"
13  in a job.  (AR 37).  This does not support Plaintiff's argument that she
14  would be unable to perform simple, repetitive tasks because of her
15  medication.  Thus, the ALJ partially credited Plaintiff's testimony.
16  It is equally clear that the ALJ's RFC was supported by substantial
17  evidence.

19              **2.    The ALJ's Hypothetical To The Vocational Expert Was**
20                     **Supported By Substantial Evidence**

22       Plaintiff does not appear to argue that the hypothetical posed at
23  the hearing to vocational expert Berry was flawed independent of its
24  reliance on the ALJ's RFC.  (See Plaintiff's Memo. at 2-4).  The
25  hypothetical clearly tracked the limitations set out by the ALJ in the
26  RFC: a non-illiterate individual with an eleventh grade education who
27  can be on her feet for two hours sporadically out of an eight-hour work
28  day, can sit but needs to stretch every thirty to sixty minutes, cannot

                                    23

1   lift any more than ten pounds, needs to lie down at midday, and would
2   miss work up to twice a month.  (AR 52).  She would be limited to
3   simple, repetitive tasks.  (Id.).  This tracks the ALJ's RFC exactly.
4   Thus, given the Court's finding that substantial evidence supported the
5   RFC, substantial evidence also supports the hypothetical.

6

7   **B.**   **The ALJ Provided Clear And Convincing Reasons For Rejecting**
8        **Plaintiff's Credibility**

9

10      The ALJ may reject a plaintiff's testimony if he makes an explicit
11   credibility finding that is "supported by a specific, cogent reason for
12   the disbelief."  Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir.
13   1990).  "Unless there is affirmative evidence showing that the plaintiff
14   is malingering, the Commissioner's reasons for rejecting the plaintiff's
15   testimony must be 'clear and convincing.'"  Lester, 81 F.3d at 834).
16   Moreover, the ALJ may not discredit a claimant's testimony solely
17   because the degree of pain alleged by the claimant is not supported by
18   objective medical evidence.  Bunnell v. Sullivan, 947 F.2d 341, 346-47
19   (9th Cir. 1991) (en banc).  Similarly, an ALJ can reject non-claimant
20   lay witness testimony "only by giving specific reasons germane to [the]
21   witness."  Regennitter, 166 F.3d at 1298.

22

23      The ALJ carefully reviewed Plaintiff's medical records (see AR 16-
24   19) and found that the objective evidence did not support Plaintiff's
25   statements regarding the "intensity, persistence, and limiting effects
26   of [her] symptoms" to the extent that those symptoms were inconsistent
27   with the RFC.  (AR 16).  The ALJ specifically cited Dr. Sainten's
28   findings, which were themselves supported by the overall evidence of

record.  (AR 16).  He further stressed that Plaintiff's July 8, 2007 exam showed minimal swelling, no discoloration or warmth, and "only a small amount of clear drainage from around the left lateral malleolus." (Id.).  Similarly, Plaintiff's October 3, 2007 examination "showed mild soft tissue swelling to the medial and lateral malleolus, but no deformity." (Id.).  An X-ray later in October 2007 showed some swelling but no infection, and one in June 2008 showed that the fractures are surgically aligned and the presence of moderate post-traumatic osteoarthritis.  (AR 17).  Although Plaintiff was treated for other conditions, none had any "more than a minimal effect on [Plaintiff's] ability to engage in work-related activities." (Id.).

Additionally, the ALJ found inconsistencies in Plaintiff's own testimony that undercut her credibility.  The ALJ pointed to Plaintiff's 2007 mental status exam, which stated that Plaintiff "dresses and bathes herself; can run errands and go to the store with help, and can cook and make snacks and participate in household shores, but she insists everything is with help because she is in a wheelchair." (AR 296).  However, the ALJ points out that Plaintiff was prescribed crutches on only two occasions, one in connection with "postsurgical pain" (AR 378) and once after she twisted the ankle that she previously had surgery on. (AR 397).  There is no evidence other than Plaintiff's own testimony that she continues to require crutches or any other assistive device. (AR 19).  Moreover, at the hearing, Plaintiff testified that she was able to do light housework and cook.  (AR 46).  She further testified at the hearing that, although she could not walk or stand for long periods of time, on good days she was able to walk "crooked" and on bad days with a limp.  (AR 40; see also AR 37 (testifying that she cannot

25

sit for long periods of time, but must get up to "maneuver"); AR 47-48 (testifying that she sat down for three-quarters of a fifteen hour day)).  None of this is consistent with Plaintiff's assertion that she is always in a wheelchair and therefore needs constant aid.  (See AR 296).

Moreover, the ALJ gave reasons germane to the witness in rejecting third-party lay witness Eselema's testimony.  The ALJ pointed out that Eselema "completed the form less than two months after [Plaintiff] had left ankle surgery," during the immediate post-surgical period.  (AR 19; see also AR 157 (form dated 11/12/06)).  The ALJ pointed out that, within a year, Plaintiff's condition had improved markedly.  (Id.).  In addition, there was no evidence that Plaintiff needed crutches, other than for the two brief periods when she was prescribed crutches in July 2007 and in October 2007.  (Id.).  He therefore reasoned that Eselema's opinion was "not useful for assessing the entire relevant period."  (Id.).  The ALJ, therefore, properly discounted Eselema's statements.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

# VIII.

## CONCLUSION

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[5] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: July 21, 2010.

/S/

_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

---

[5] This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

27